HERNANDEZ v. ROBERTSON, Commissioner of Patents.

(District Court, D. Maryland. January 2, 1926.)

No. 873.

1. Patents ⟜114—Evidence as to patentee's failure to apply for reissue because of poverty and sickness held insufficient to authorize relief (Comp. St. §§ 9460, 9461).

Evidence, in suit by administratrix of patentee, under Comp. St. § 9460, relative to failure of patentee to apply for reissue within two years under section 9461, because of poverty and sickness, *held* to preclude relief.

2. Patents ⟜114—Alleged irregularities in Patent Office held not to show fraud or intentional impropriety, authorizing relief against refusal of reissue patent.

Alleged irregularities in Patent Office in connection with another application, resulting in failure to have interference filed, *held* insufficient to show fraud or intentional impropriety, which would be ground for equitable relief against refusal of reissue patent to correct defects in original patent.

Jacob F. Murbach, of Baltimore, Md., and Benjamin Roman, of New York City, for plaintiff.

Col. A. W. W. Woodcock, U. S. Atty., of Baltimore, Md., and T. A. Hostetter, of Washington, D. C., for defendant.

SOPER, District Judge. Arturo Hernandez-Mejia was the inventor of certain improvements in the method of producing photographic transparencies in color, and product thereof, and on June 21, 1912, filed an application for patent, which was granted on March 7, 1916, as patent No. 1,174,144. After the issuance of the patent, it was thought by the inventor to be defective, because its claims for the process were not sufficiently broad, and because it failed to claim the product, and also because certain patents said to be for the identical invention were subsequently granted to Thornton, Nos. 1,-245,822 and 1,250,713. On December 31, 1918, Hernandez filed an application in the Patent Office for the reissue of his patent under the terms of R. S. § 4916 (Comp. St. § 9461), alleging that the defects arose from inadvertence, accident, and mistake. The application for reissue was thus filed more than two years after the grant of the patent. The accompanying oath was thought by the examiner to be insufficient, in that it did not explain the long delay in making the application, whereupon an additional oath was made, setting up the claim that the decedent used due diligence in applying for the reissue, but was prevented by poverty, sickness, and bankruptcy from filing his reissue application prior to December 31, 1918.

The Primary Examiner, however, refused to grant a reissue patent to the plaintiff, on the ground that the defects in the patent were not due to inadvertence, accident, or mistake, and that there was no sufficient excuse for the delay in filing the reissue application. Thereupon Hernandez appealed to the Board of Examiners in Chief, which affirmed the decision of the Primary Examiner, and a like decision was made on appeal to the Commissioner of Patents, and finally by the Court of Appeals of the District of Columbia. See 298 F. 1019, 54 App. D. C. 404. The Court of Appeals, in a per curiam decision, concurred in the findings of the Patent Office, basing the decision on the line of cases which hold that, after a lapse of two years after the issue of a patent, a reissue, seeking to enlarge the claim of the original patent, will not be granted, unless special circumstances are shown to excuse the delay.

Hernandez died September 24, 1920. The suit is brought by the administratrix, under the provisions of R. S. § 4915 (Comp. St. § 9460), which provides that, whenever a patent on application is refused, either by the Commissioner of Patents or by the Supreme Court of the District of Columbia, upon appeal from the Commissioner, the applicant may have remedy by bill in equity. Comp. St. § 9456, substitutes the Court of Appeals for the Supreme Court of the District of Columbia.

[1] The case has been submitted on the record and brief filed in the Court of Appeals. The decisions of the several tribunals in the Patent Office have been examined, and there appears to be no reason for a different conclusion from that reached by them and affirmed by the Court of Appeals. It may serve some purpose very briefly to summarize the facts adduced by the complainant to show the special circumstances justifying the application after the expiration of two years from the date of the patent.

It is claimed that subsequent to that date, covering a period from March 17, 1916, to May 20, 1917, the patentee tried to collect funds, first, for the erection of a factory to manufacture the product; and, second, to enable him to file divisional applications for

the patent. The last procedure was necessitated by the decision of the Patent Office to the effect that the patentee was not entitled upon his original application to receive a patent covering, not only the process, but also the article. The patentee protested against the decision, but, claiming that he was financially unable to file divisional applications, amended his original application, so as to confine the claims to the process. In his oath attached to the application for reissue, the patentee alleged that he was unable during the last-mentioned period to collect funds, either for the manufacture of the goods or to pay the expense of divisional applications.

For the period from May 20, 1917, to August 10, 1917, the patentee was seriously sick and unable to attend to business. On August 10, 1917, the patentee went into bankruptcy. He was discharged therefrom by order of court of May 28, 1918, but there was an objection to the order, and the final discharge was not granted until November 28, 1918. On December 31, 1918, the application for reissue was made.

Unexplained, this recital makes a substantial showing of special circumstances which would go far to explain the delay. It does not, however, tell the whole story. In the first place, prior to the summer of 1918, Hernandez was of the opinion that his patent gave him all the protection that he needed. He intended to prosecute a divisional application, but with this exception believed that the specification of his patent was so worded as to fully cover the invention. He so testified in the interference proceeding against William V. D. Kelley, involving his patent, which was begun June 25, 1918. On or about June 1, 1918, the patentee discovered the Kelley patent of March 12, 1918, which embodied certain claims that appeared to dominate and affect various subject-matters not yet covered by the divisional applications. Becoming alarmed, he went to a lawyer's office and was there informed that it was vital that he file an application which would place him in interference with the Kelley patent, and that he could not file divisional applications any longer, but would have to file an application for reissue, in order to secure his original patent rights.

It further appears that the applicant was not altogether without funds with which to pursue proceedings in the Patent Office. On October 11, 1917, he filed and paid for an application for patent No. 1,282,829, to be used in conjunction with the patent in suit. In 1917 and 1918 seven patent proceedings were filed, including the application for the reissue, the Kelley interference proceedings, and the above patent No. 1,282,829. The Kelley interference itself was an elaborate and expensive proceeding.

Again, as appears in the record in the Kelley proceedings, the patentee was asked whether, at any time after he made his invention, he had the means to file an interfering application, if he desired to file it, and replied that it was not always easy or convenient, but that he could have made an effort and obtained the money.

Again, in the same suit, the patentee's attention was called to a statement that he had received financial help during the years 1912 to 1917, inclusive, in working with his inventions, making experiments and running places at Sixth avenue, New York, and at New Rochelle, and he was asked to state approximately the amount of money received in each year. He replied that the total cash expenditures to date, March 12, 1919, was $89,000, of which $84,000 was spent prior to June 24, 1918. The control of this expenditure was in the hands of the people who furnished it. The patentee stated that every dollar that he could save from the support of his family had been invested in the experiments, but he could not be precise as to the amount, although it did not exceed $10,000; but, during the period that he was going through bankruptcy, he had no means of making a monetary contribution.

When these admitted activities and experiments are considered as a whole, it is clear that the applicant has not demonstrated that he was prevented by poverty or sickness from filing his application for reissue prior to December 31, 1918.

In his brief in the Court of Appeals, the complainant's attorney summarized the ground for reissue as follows: (1) That the original patent is defective, because it lacks a claim for the product, because its claims for process are not sufficiently broad, and because the Patent Office granted the Thornton patents for the identical subject-matter, which creates a cloud over the applicant's rights. (2) That the defects in the original application arose from inadvertence, accident, and mistake, due to irregularities in the examination of the original application by the Patent Office. (3) That the applicant was prevented by poverty and sickness from filing his divisional application prior to March 7, 1918, and his reissue application prior to December 31, 1918.

R. S. 4916 (Comp. St. § 9461), authorizes the Commissioner to reissue a patent

inoperative by reason of a defective specification, if an error has arisen by inadvertence, accident, or mistake. The courts have added to the requirement the rule that the application must be made within two years. Since it appears that such action was not taken in this case, and the failure so to do is not satisfactorily explained, the applicant has failed to comply with the terms of the statute.

[2] A large part of the complainant's brief is taken up with a discussion of certain alleged irregularities in the Patent Office. It is not clear what relevancy these charges have, except to show that thereby the patentee was led into mistakes which may be corrected by timely application under the provisions of section 4916. See Morey v. Lockwood, 75 U. S. (8 Wall.) 230, 19 L. Ed. 339. The bill of complaint makes no allegation of intentional misconduct or of fraud. It is alleged that the defects arose from inadvertence, accident, and mistake, produced by irregularities committed by the Patent Office in connection with the Hernandez application and the Thornton application. In the brief, however, a different attitude is assumed. The irregularities of the Patent Office are there summarized as follows:

(1) That the examiner wrongfully insisted upon the division of the Hernandez application, notwithstanding the protest of the applicant, who pleaded poverty; (2) that the examiner wrongfully insisted upon the revision of the original application to a point that tended to render it defective and insisted upon the inclusion of limitations in the claims that were unnecessary; (3) that the insistence upon revision was coupled with unreasonable criticism, obstruction, and delay, all of which wore out the applicant financially, so that he was unable to take an appeal and was obliged to dismiss his attorney; (4) that the Patent Office actually misled the applicant into the pitfall of embodying limitations, actually prosecuted the application for him, and shaped for him the defective patent; (5) that the Patent Office unlawfully issued patents for the same invention to Thornton, and did this deliberately and with full knowledge of the Hernandez application.

In the complainant's brief there are a number of expressions which are tantamount, or very close, to a charge of fraud, as, for instance, that the insistence on divisional applications was intended to harass and injure the application; that the applicant submitted a clearly supportable broad claim, and the examiner went out of his way, in a wrongful manner, to artfully inveigle the applicant into the inclusion of unnecessary limitations in his claims.

There is also a discussion of the alleged injury to the applicant by issuing patents for the same invention to Thorton. It may be summarized as follows: During the same three years in which the original Hernandez application was pending in Division 36 of the Patent Office, there was filed and continuously copending in Division 7 two patent applications of Thornton. It is claimed that the file wrapper in the Thornton patent shows that the way was paved and every obstacle eliminated for the issuance of the Thornton patent, while every possible impediment was imposed to destroy the Hernandez rights.

Much is made of the fact that the Hernandez application was transferred from Division 7 to 36 just prior to the filing of the Thornton application in Division 7. It is contended that since the Thorton patent was filed on April 10, 1913, about a month and a half after the Hernandez application was transferred to Division 36, Division 7 of the Patent Office should have taken notice of the Hernandez application, and declared an interference between it and the Thornton application. It is claimed that this was not mere negligence. On March 14, 1913, Division 7 received by mail a communication in regard to the Hernandez application and transferred it to Division 36. This was only three weeks before Thornton's filing date. On September 19th amendment of Hernandez was received by Division 7 and transferred to Division 36 on the same day. This was over five months before the filing of the Thornton application, and after it had been acted upon on June 5th. On September 8, 1915, another Hernandez amendment was sent to Division 7 and transferred to Division 36.

Certain other circumstances are said to show that the injury was willfully rather than negligently caused. In the first action on Thornton, June 5, 1913, there was a citation of the Hernandez process in an article written by Hernandez in the Moving Picture News. It is contended that this should have apprised Division 36 of the probability that somewhere in the office of Division 7 or 36 there was pending an application by Hernandez. Thorton's attorney pointed out that the article by Hernandez was subsequent to Thorton's British application of April 19, 1912. The fact that Thornton, although an American, filed his first application in England, a decidedly disadvantageous proceed-

ing for an American, should have aroused the attention of the examiner and led him to suspect that the author of the article had a concurrent application pending. Such a novel and useful invention would naturally lead to a patent application.

Hernandez's application in Division 36 was issued March 7, 1916, and Thornton's application in Division 7 on August 29, 1916. Thereafter, on September 22, 1916, the Thornton application was withdrawn from issue, and on September 23 his claims were rejected on the Hernandez patent, the same having been discovered by Division 7. The office, however, of its own accord, suggested to Thornton that he should avail himself of the benefit of the date of his foreign application, by filing a certified copy thereof. It is urged that this action shows that grievous injustice to Hernandez was committed, since it was the duty of the Patent Office to notify Hernandez, and suggest to him the surrender of his patent for reissue and for interference purposes, particularly since the Hernandez file wrapper showed claims of reduction to practice a long time before April, 1912. Finally, the Thornton patent was issued after the filing of a copy of the British patent on December 18, 1916. Coincidently there was a similar action with the Thornton patent for a process or method. It is claimed that under these circumstances, even if there was no willful injury, it was the duty of the Patent Office, under R. S. § 4904 (Comp. St. § 9449), to declare an interference between Thornton's application and Hernandez's patent.

A consideration of all these arguments, which have been elaborated with industry and skill by complainant's attorney, does not convince one that there was fraud or intentional impropriety in the Patent Office. Possibly there were mistakes, or lack of care, but nothing that could not have been remedied by seasonable application of the methods for review provided by the statutes.

The bill of complaint will be dismissed.